10-3633-cv
Cox v. Warwick Valley Cent. School Dist.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: May 31, 2011    Decided: August 17, 2011)

Docket No. 10-3633-cv

- - - - - - - - - - - - - - - - - - - -x

EVERETT W. COX III and NAN PING PENG,
individually and on behalf of their
minor son NAN PING RAPHAEL COX,

    *Plaintiffs-Appellants*,

    -v.-                                    10-3633-cv

WARWICK VALLEY CENTRAL SCHOOL DISTRICT,
JOHN KOLESAR individually and as
PRINCIPAL OF WARWICK MIDDLE SCHOOL,

    *Defendants-Appellees*.[*]

- - - - - - - - - - - - - - - - - - - -x

Before:        DENNIS JACOBS, <u>Chief Judge</u>,
               DEBRA ANN LIVINGSTON, <u>Circuit Judge</u>,
               JED S. RAKOFF, <u>District Judge</u>.[**]

---

[*] The Clerk of Court is respectfully instructed to amend the official case caption as shown above.

[**] The Honorable Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (Gwin, J., sitting by designation) granting summary judgment in favor of a school district and principal on § 1983 claims arising out of the treatment of their son, a middle school student. Plaintiffs appeal the dismissal of a First Amendment retaliation claim brought on behalf of their son, and the dismissal of their own Fourteenth Amendment substantive due process claim. Affirmed.

FOR APPELLANTS: Christopher D. Watkins (Michael H. Sussman, *on brief)* Sussman & Watkins Goshen, NY

FOR APPELLEES: Patrick J. Fitzgerald, III Scott P. Quesnel Girvin & Ferlazzo, P.C. Albany,NY

DENNIS JACOBS, Chief Judge:

Everett Cox III and Nan Ping Peng, parents of a middle school student, appeal from a judgment of the United States District Court for the Southern District of New York (Gwin, J., sitting by designation) dismissing on summary judgment their § 1983 complaint against Warwick Valley Central School District and Principal John Kolesar. Cox and Peng appeal

the dismissal of: [1] a First Amendment claim brought on behalf of their son, alleging that Kolesar retaliated against the boy for his school essay by temporarily placing him in the school's suspension room and by reporting the parents to the state's Department of Child and Family Services for suspected abuse or neglect; and [2] the parents' Fourteenth Amendment substantive due process claim, alleging that the same report to Child and Family Services infringed their right to custody of their son.  We affirm.

## BACKGROUND

John Kolesar is the Principal of Warwick Valley Middle School ("Warwick"), which was attended by Raphael Cox, the plaintiffs' son.  During his time at Warwick, Raphael exhibited a pattern of misbehavior:  He threw objects at classmates, interrupted class instruction, fought with other students, and brought contraband to school (fireworks, lighters, and alcohol).  Kolesar suspended Raphael on multiple occasions for these infractions.  At a meeting with Kolesar in late 2006, Raphael and his parents signed a "behavioral contract" that placed Raphael on probation and

specified that further misconduct would result in more severe discipline, possibly including expulsion.

Raphael continued to misbehave, fighting with other students and vandalizing school property.  He also continued to display violent tendencies and ideations:  He made an inappropriate comment in class about flying a plane into a building, he was overheard by a teacher talking about blowing up things, and he brought to school what administrators perceived to be a makeshift metal weapon.  As a result, Kolesar requested another meeting with the parents.

In February 2007, the parents met with several Warwick school administrators, including Kolesar and the school psychologist.  The administrators requested that Raphael undergo a psychiatric evaluation.  The parents resisted, but agreed to have Raphael seen by a psychologist.  After Raphael met with the psychologist, the parents gave Kolesar a copy of the evaluation.

In March 2007, Raphael's English teacher assigned Raphael to write an essay on what he would do if he had only 24 hours to live.[3]  Raphael's essay, titled "Racing Time,"

_____

[3] There is some disagreement between the parties as to what the essay assignment was, but at least one other

4

described getting drunk, smoking, doing drugs, and breaking the law. It ended with Raphael taking cyanide and shooting himself in the head in front of his friends at the end of the 24 hours. Raphael submitted the essay to his teacher, but never presented it to his class or shared it with his fellow students.

Concerned about its casual description of illegal activity, violence, and suicide, Raphael's teacher showed Racing Time to Kolesar. Kolesar immediately took Raphael out of class to discuss it. Raphael explained that the essay was fictional and that he did not intend harm to himself or others. Kolesar then sequestered Raphael in the in-school suspension room ("ISS Room") for the rest of the afternoon while he considered whether Raphael posed an imminent threat to himself or others, and whether he should be disciplined for his essay. Kolesar concluded that there was no immediate threat and that discipline was not appropriate. Raphael was sent home at the end of the day.

Before school the next morning, Kolesar met the school psychologist and guidance counselors to discuss Raphael's

student appeared to interpret it the way Raphael did; so taken in the light most favorable to the plaintiffs, we assume that the students were assigned to write what they would do if they had only 24 hours to live.

5

emotional health and Kolesar's perception that the parents were insufficiently concerned about Raphael's misbehavior and emotional well-being. After the meeting, Kolesar reported to the district Superintendent, who reminded Kolesar of his legal obligation to report suspected abuse or neglect to the state department of Child and Family Services ("CFS").

Kolesar then called CFS and reported his concern that the parents were neglecting Raphael. The CFS narrative on Kolesar's call stated:

> Narrative: 13 yr old Rafael has been repeatedly writing in his journal violent homicidal and suicidal imagery while in school. He has also participated in acts of vandalism and brought dangerous objects into school such as fireworks and pieces of metal. Rafael recently expressed suicidal thoughts and had a very descriptive plan for doing it in that he would take his favorite weapon, a ruger place it in his mouth with a cyanide pill and shoot himself and everyone would party for a week. The school recommended to the parents that they seek a psychiatric evaluation for their son but they have refused to do so. The parents are minimizing the child's thoughts and behaviors and state that this is just fiction and all a misunderstanding. It is believed the child is a danger to himself and other[s] at this point. The parents are failing to provide a minimal degree of care to their son.

That afternoon, a CFS worker told the parents to meet her at Warwick. When they arrived, the CFS worker insisted

that they take Raphael to the hospital immediately to undergo a psychiatric evaluation, and warned that otherwise they could lose custody. The parents complied, and Raphael was evaluated that evening.

After this incident, the parents home-schooled Raphael for the rest of the year. The CFS investigation eventually concluded Kolesar's concern was "unfounded." No further state action was taken.

The parents filed a § 1983 suit against Kolesar and Warwick in federal district court, alleging that Kolesar violated Raphael's First Amendment speech rights by disciplining him for his essay and that Kolesar violated the parents' Fourteenth Amendment substantive due process right to custody over Raphael by making an exaggerated or false report to CFS. The district court granted summary judgment to Kolesar and Warwick on both claims. The parents now appeal.

**DISCUSSION**

We review <u>de novo</u> a district court's grant of summary judgment. <u>Costello v. City of Burlington</u>, 632 F.3d 41, 45 (2d Cir. 2011). When considering a motion for summary

7

judgment, we view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  Id.  Summary judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law."  Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996) (internal quotation marks omitted).

To state a § 1983 claim, a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law.  Haywood v. Drown, 129 S. Ct. 2108, 2111 (2009).  Kolesar concedes he was acting under the color of state law when he placed Raphael in the ISS room and reported the parents to CFS.  The sole question on appeal is whether these actions deprived Raphael or his parents of any federal or constitutional right.  The parents argue that Kolesar's actions constituted retaliation against Raphael for his Racing Time essay in violation of his First Amendment rights, and that Kolesar's report to CFS violated their Fourteenth Amendment substantive due process right to custody of Raphael.  We conclude that Kolesar did not violate the rights of the child or of the parents.

8

To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech. Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003); see also Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010).

The parents argue that Raphael's Racing Time essay was protected speech and that placing Raphael in the ISS Room and calling CFS were adverse actions taken because of the essay. Kolesar concedes that Raphael's Racing Time essay was a substantial cause of his decision to put Raphael in the ISS Room for an afternoon and report the parents to CFS; Kolesar disputes that these actions constituted adverse actions, and that Raphael's Racing Time essay was speech protected by the First Amendment.

The district court concluded that there was "at least material factual dispute as to whether Kolesar took an adverse action against Raphael as a result of his speech," but that summary judgment for Kolesar was appropriate on the

First Amendment claim because Raphael had no protected speech right in his Racing Time essay as a matter of law. Cox v. Warwick Valley Cent. School Dist., No. 7:07-CV-10682, 2010 WL 6501655, at *7-8 (S.D.N.Y. Aug. 16, 2010). We affirm for different reasons.

**A**

"[S]tudents do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"; however, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." Morse v. Frederick, 551 U.S. 393, 396-97 (2007) (internal quotation marks omitted). As a general rule, student speech in school is protected under the First Amendment unless it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Tinker v. Des Moines Indep. Cmty. School Dist., 393 U.S. 503, 509 (1969) (internal quotation marks omitted).

There are exceptions. When students speak pursuant to the school curriculum such that their speech may be perceived as being endorsed or promoted by the school--e.g.,

10

school newspapers, theatrical productions--school administrators may exercise editorial control over that speech "so long as their actions are reasonably related to legitimate pedagogical concerns." Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 271-73 (1988). Moreover, school administrators may, as part of their responsibility to "teach[] students the boundaries of socially appropriate behavior," punish student speech that is vulgar, lewd, or threatening, at least where that speech occurs publicly at school or a school-related event. Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986); see also Morse, 551 U.S. at 404-06.

However, we need not reach the question whether Raphael's speech was protected by the First Amendment because we conclude that none of Kolesar's actions in response to Raphael's speech constituted retaliation.

**B**

First Amendment student speech cases ordinarily involve explicit censorship or avowedly disciplinary action by school administrators. See e.g., Morse, 551 U.S. at 396 (student suspended for displaying drug-promoting banner at school activity); Fraser, 478 U.S. at 678 (student suspended

11

for lewd speech at school event); Hazelwood, 484 U.S. at 263-4 (articles banned from student newspaper); Tinker, 393 U.S. at 504 (school ban on black armbands); Doninger, 642 F.3d at 340-42 (student prohibited from running for student council for derogatory blog post about school event); Wisniewski v. Bd. of Educ. of the Weedsport Cent. School Dist., 494 F.3d 34, 35-36 (2d Cir. 2007) (student suspended for violent drawing distributed electronically to other students).  There is therefore no clear definition of "adverse action" in the school context.

Outside the school context, an adverse action in a First Amendment retaliation case is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnick v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted).  Under this "objective" standard, an adverse action must be more than "de minimis" to support a First Amendment retaliation claim.  Id. at 226. Recognizing that this test is highly context-specific, id., we apply it "in light of the special characteristics of the school environment." Tinker, 393 U.S. at 506.

12

Teachers and school administrators have multiple responsibilities: teaching, maintaining order, and protecting troubled and neglected students. Cf. N.Y. Soc. Serv. Law § 413(a) (making teachers and school administrators "mandatory reporters" legally obligated to report suspected child abuse and neglect to CFS). They are part disciplinarian, and part protector. Id.

The state's interest in encouraging teachers to protect students is so powerful that New York confers immunity from civil and criminal liability whenever they report suspected abuse in good faith, and it exposes them to criminal and civil liability whenever they willfully fail to do so. See id. § 419 (providing immunity from criminal and civil liability when mandatory reporters report suspected child abuse in good faith and creating a presumption that all reports of suspected abuse are made in good faith); id. § 420 (subjecting mandatory reporters to criminal and civil liability for willful and knowing failure to report suspected abuse and neglect); Sclar v. Fayetteville-Manlius School Dist., 753 N.Y.S.2d 636, 637 (App. Div., 4th Dep't, 2002) (recognizing immunity for good faith compliance with

13

the mandatory reporting requirements and the need for plaintiffs to allege actual malice in making the reports).

In their various roles, school administrators must distinguish empty boasts from serious threats, rough-housing from bullying, and an active imagination from a dangerous impulse.  Making such distinctions often requires an investigation, and the investigation may result in discipline, but the investigation itself is not disciplinary--it is precautionary and protective.  This is so even when a student is separated, interviewed, or temporarily sequestered to defuse a potentially volatile or dangerous situation.  See Kolesar Dep. at 45:6-9 ("Students that could potentially receive out-of-school suspension in our Code of Conduct are to be supervised in an in-school suspension room until a decision is made.").  As in this case, a school administrator must be able to react to ambiguous student speech by temporarily removing the student from potential danger (to himself and others) until it can be determined whether the speech represents a real threat to school safety and student learning.  Such acts deserve "unusual deference" from the judiciary.  See Kia P. v. McIntyre, 235 F.3d 749, 758-59 (2d Cir. 2000) (recognizing

14

that mandatory reporters face the dilemma that aggressive action to protect children can expose them to civil liability for due process violations while inadequate action to protect children can expose them to § 1983 liability and concluding that courts must give mandatory reporters "unusual deference" in this context).  Without more, the temporary removal of a student from regular school activities in response to speech exhibiting violent, disruptive, lewd, or otherwise harmful ideations is not an adverse action for purposes of the First Amendment absent a clear showing of intent to chill speech or punish it.

Although a student and his parents might perceive such removal as "disciplinary" or "retaliatory," its objective purpose is protective.  It affords the administrator time to make an inquiry, to figure out if there is danger, and to determine the proper response:  discipline, a benign intervention, or something else.  A school cannot function without affording teachers and administrator fair latitude to make these inquiries.

Under this standard, Kolesar's decision to remove Raphael from class for an afternoon cannot support a First Amendment retaliation claim, regardless of how Raphael or

15

his parents may have perceived Kolesar's actions.  Kolesar took a precautionary measure to ensure that ambiguous student expression did not portend disruption or violence. We owe this decision "unusual deference," and absent a clear showing of retaliatory or punitive intent, it cannot be considered "adverse" or "retaliatory."

For the same reason, Kolesar's decision to report Raphael's parents to CFS, without any evidence of retaliatory or punitive intent as to the child, is not an adverse action against Raphael as a matter of law.  By its nature, the call was a protective-- not disciplinary--act, and was therefore not an "adverse action" for purposes of Raphael's First Amendment retaliation claim.  Any other conclusion would place school administrators in an impossible bind.  Abuse, neglect, and impairment are often disclosed or suggested by a child's words or acts, and school administrators have a legal obligation to report suspected abuse and neglect to CFS.  If such reports-- inevitably based in part on the student's speech or conduct--could result in § 1983 liability, administrators would be exposed to civil liability no matter what they did. Cf. id. at 758-59 (recognizing that mandatory reporters are

16

obliged to choose "between difficult alternatives in the context of suspected child abuse.  If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in [not doing so], they risk injury to the child and may be accused of infringing the child's rights.").  Their only choice would be whether to suffer 42 U.S.C. § 1983 liability for reporting or N.Y. Soc. Serv. Law § 420 liability for not doing so.  Kolesar had a legal obligation to report suspected child neglect to CFS, an obligation arising precisely from his responsibility to keep his students safe. Allowing such reports to generally constitute retaliation against the *children* would seriously undermine school administrators' ability to protect the children entrusted to them.

Because neither of Kolesar's actions in response to Raphael's essay was adverse, we affirm the district court's grant of summary judgment to Kolesar on the First Amendment retaliation claim.  We need not reach the question whether Kolesar would be entitled to qualified immunity.

The parents allege that Kolesar's call to CFS violated their substantive due process rights under the Fourteenth amendment by interfering with their custody of Raphael.

"Choices about marriage, family life, and the upbringing of children" are "of basic importance in our society." M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (internal quotation marks omitted). The interest of natural parents "in the care, custody, and management of their child" is a "fundamental liberty interest protected by the Fourteenth Amendment." Santosky v. Kramer, 455 U.S. 745, 753 (1982). "[F]amily members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." Anthony v. City of New York, 339 F.3d 129, 142 (2d. Cir. 2003) (internal quotation marks omitted). This right is amplified by the more general substantive due process right of all people to be free of government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense." Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995).

To state a claim for a violation of this substantive due process right of custody, a plaintiff must demonstrate that the state action depriving him of custody was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999).  It is not enough that the government act be "incorrect or ill-advised"; it must be "conscience-shocking."  Kaluczky, 57 F.3d at 211.  "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional."  Tenenbaum, 193 F.3d at 600 (internal quotation marks omitted).

Absent truly extraordinary circumstances, a brief deprivation of custody is insufficient to state a substantive due process custody claim.  Nicholson v. Scoppetta, 344 F.3d 154, 172 (2d Cir. 2003); see also Anthony, 339 F.3d at 143; Tenenbaum, 193 F.3d at 601.  Such temporary deprivations do "not result in the parents' wholesale relinquishment of their right to rear their children," so they are not constitutionally outrageous or

conscience-shocking.  Nicholson, 344 F.3d at 172 (brackets and internal quotation marks in original omitted).

Kolesar's call to CFS and the resulting demands and threats from CFS to the parents may have been stressful or even infuriating, but they did not result in even a temporary loss of custody, let alone a "wholesale relinquishment of rights."  The parents maintained custody over Raphael during his entire (concededly coerced) psychiatric evaluation.  Where there is no actual loss of custody, no substantive due process claim can lie. Nicholson, 344 F.3d at 172; Anthony, 339 F.3d at 143; Tenenbaum, 193 F.3d at 601.

Moreover, no reasonable jury could conclude that Kolesar's report to CFS, or the resulting requirement that Raphael be psychiatrically evaluated, was even remotely "outrageous" or "conscience-shocking."  Common negligence is categorically insufficient to shock the conscience, so the parents must raise an inference that Kolesar acted maliciously before his call to CFS can even begin to support a violation of substantive due process.  Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998) ("We have accordingly rejected the lowest common denominator of customary tort

20

liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). The parents allege that Kolesar's report to CFS was exaggerated and misleading, but even in the light most favorable to them, nothing in the report was materially false: Raphael wrote violent journal entries, misbehaved in school, and expressed suicidal thoughts, albeit in a hypothetical, creative, imagined way. Furthermore, Kolesar's actions were expressly aimed at protecting Raphael, and Kolesar had a legal obligation to report suspected neglect. There is no evidence that Kolesar acted with the type of malice needed to shock the conscience.

We therefore affirm the district court's grant of summary judgment in favor of Kolesar and Warwick on this claim. We need not reach the question of qualified immunity.

## CONCLUSION

For the reasons stated above, the judgment of the district court is **AFFIRMED**.