10-2282-cv
**Cuff v. Valley Central School District, et al**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: March 10, 2011      Decided: March 22, 2012)

Docket No.  10-2282-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM CUFF, MARGARET CUFF, on behalf of their minor son,

B.C.,

Plaintiffs-Appellants,

v.

VALLEY CENTRAL SCHOOL DISTRICT, BARBARA KNECHT, sued in her

individual capacity,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, POOLER and HALL, Circuit Judges.

Appeal from a grant of summary judgment in the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) dismissing a complaint that alleged that an elementary school student's First Amendment rights were violated when he was suspended for six days after expressing a wish for violence to the school and teachers.  We affirm.

Judge Pooler dissents in a separate opinion.

1

STEPHEN BERGSTEIN,
Bergstein & Ullrich, LLP
Chester, New York, for
Plaintiffs-Appellants.

ADAM I. KLEINBERG (Leo Dorfman,
on the brief), Sokoloff Stern LLP
Westbury, New York, for
Defendants-Appellees.

WINTER, Circuit Judge:

William and Margaret Cuff appeal from Judge Rakoff's grant of summary judgment dismissing their complaint brought on behalf of their minor son B.C. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist., 714 F. Supp. 2d 462 (S.D.N.Y. 2010). Their appeal concerns the contours of B.C.'s First Amendment rights and the regulation of his speech in school. We affirm.

BACKGROUND

Because this is an appeal from a grant of summary judgment, we view the facts in the light most favorable to appellants and resolve all disputes of fact in their favor. Mathirampuzha v. Potter, 548 F.3d 70, 72-73 (2d Cir. 2008).

Briefly stated, this litigation arises out of a crayon drawing by B.C. in response to an in-class assignment. The drawing depicted an astronaut and expressed a desire to "[b]low up the school with the teachers in it." At the time, September 2007, B.C. was ten years old and a fifth-grade student at Berea Elementary School in Montgomery, New York.

In January 2006, prior to creating the astronaut drawing, B.C. had drawn another picture that was perceived by the school staff as disturbing. The drawing depicted a person firing a gun, and above it, B.C. had written: "One day I shot 4 people each of them got fo[ur] blows + they were dead. I wasted 20 bulits [sic] on them." B.C.'s teacher alerted the school psychologist, Delaine Charette, to the drawing, and school officials contacted B.C.'s parents. B.C. said that he was portraying a game of paintball in the drawing.

In the spring of 2007, as part of a fourth grade in-class assignment, B.C. wrote a story about "a big wind [that] destroyed every school in America. . . . [And] every body ran for there [sic] life and than [sic] all adults died and all the kids were alive. Than [sic] all the kids died." This story was also reported to Charette, although she did not speak with B.C. about it.

Prior to September 2007, B.C. had also been disciplined by teachers and school administrators for misbehavior in and around school. B.C. testified that he had been to Principal Knecht's office and Assistant Principal Malley's office on a few occasions prior to the astronaut drawing incident. Knecht and Malley also confirmed B.C.'s involvement in numerous altercations during recess, pushing and shoving in the hallways, and rough play at school.

3

The precise circumstances involving the creation of the astronaut drawing are as follows. On September 12, 2007, B.C.'s science teacher, Tara DeBold, asked her students to fill in a picture of an astronaut and write various things in various sections of the astronaut. The students were instructed to write a "wish" in the left leg of the astronaut. B.C. testified that DeBold told the students that "you can write, like, anything you want . . . you can involve a missile . . . [y]ou can write about missiles." In that spot, B.C. wrote his "wish": "Blow up the school with the teachers in it."

At this time, B.C. was seated at a block of six desks pushed together. B.C. told his nearby classmates what he was going to write in the picture, and the students laughed in response. C.P., a female student who was sitting in a neighboring group of desks, heard from another student about what B.C. drew, and went to look at B.C.'s picture. B.C. said that C.P. laughed at it. C.P. then approached DeBold -- who perceived C.P. to be "very worried" -- and told the teacher about the drawing. DeBold then approached B.C. and asked him if he meant what he had written. B.C. looked at DeBold with a blank and serious face. DeBold then sent B.C. to Principal Knecht's office.

Principal Knecht and Assistant Principal Malley asked B.C. if he meant what he had written in the drawing. B.C. testified

4

that he told them that he did not mean what he had written. Knecht then called Superintendent Richard Hooley for advice regarding B.C.'s punishment. Knecht summarized for Hooley the events that had occurred, B.C.'s history of misbehavior in school, and her concerns that B.C. had frightened C.P. Hooley stated that suspension was appropriate.

At the end of the meeting, Knecht and Malley asked B.C. to sign a document consisting of Knecht's notes transcribed during the meeting. Although B.C. testified that he could not read the script handwriting, he signed the document. Later that afternoon, Knecht met with B.C. and his parents. During the meeting, B.C. stated that he did not mean what he had written in the astronaut drawing and that he was only kidding.

Following the meeting with B.C.'s parents, Knecht confirmed in writing that B.C. was to be suspended for five days out of school and one day in school based on the "wish."

Appellants appealed the suspension to the District's Board of Education. The Board upheld the suspension, and the Cuffs did not appeal to the New York State Commissioner of Education. Appellants then brought the present Section 1983 action on behalf of B.C., alleging that by suspending B.C., the District and Knecht violated B.C.'s First Amendment right to freedom of expression. Appellants also alleged that appellees imposed an excessive punishment in disciplining B.C. as a result of the astronaut drawing.

5

The late Judge Conner, to whom this case was first assigned, granted appellees' motion to dismiss for failure to state a claim. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. ("Cuff I"), 559 F. Supp. 2d 415, 424 (S.D.N.Y. 2008). Appellants appealed, and we vacated and remanded, holding that, without some context, the facts alleged in the complaint did not dictate a Fed. R. Civ. P. 12(b)(6) dismissal. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. ("Cuff II"), 341 F. App'x 692, 693 (2d Cir. 2009.) We noted, in particular, that the facts, as alleged, indicated that only the teacher saw B.C.'s "wish" and that B.C. had no disciplinary history. Id. On remand, the parties completed discovery, and appellees moved for summary judgment. Judge Rakoff, to whom the case was reassigned following the death of Judge Conner, granted the motion. Cuff ex rel. B.C. v. Valley Cent. Sch. Dist. ("Cuff III"), 714 F. Supp. 2d 462, 463 (S.D.N.Y. 2010). We affirm.

DISCUSSION

"We review a district court's grant of summary judgment de novo." See Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

a) Legal Standards

Public school students are protected by the First Amendment and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506

(1969).  Nonetheless, "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (internal quotation marks and citation omitted). Student speech may be curtailed if the speech will "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Tinker, 393 U.S. at 509 (internal quotation marks omitted). School authorities may suppress student speech to prevent material disruption in the schools, when they have more than an "undifferentiated fear or apprehension of disturbance" and can show that their action "was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  Id. at 508, 509.

In applying Tinker, we have held that "the relevant inquiry is whether 'the record . . . demonstrate[s] . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'"  DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 78 (2d Cir. 2010) (quoting Tinker, 393 U.S. at 514) (alterations in original).  This test does not require school administrators to prove that actual disruption occurred or that substantial disruption was inevitable.

7

Rather, the question is "whether school officials might reasonably portend disruption from the student expression at issue." Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir. 2008) (internal quotation marks omitted).  As the district court in Cuff III stated, "an actual disruption standard would be absurd."  714 F. Supp. 2d at 469.

The test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student.  See Tinker, 393 U.S. at 514 (holding that the objective reasonableness of the school administrator's response, not the student's intentions, is relevant); Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 40 (2d Cir. 2007) (holding that a student's generation and transmission of an internet "buddy icon" from his parent's home computer supports a reasonable probability of substantial disruption at the school and permitting school discipline "whether or not [the student] intended [the speech] to be communicated to school authorities or, if communicated, to cause a substantial disruption"); Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 767, 772 (5th Cir. 2007) (holding that a high-school student's violent story depicting a school shooting was not constitutionally protected, despite the student's claim that he meant it as a work of fiction and not a threat); Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 981, 984-85 (11th Cir. 2007) (same).

Finally, in the context of student speech favoring violent conduct, it is not for courts to determine how school officials should respond.  School administrators are in the best position to assess the potential for harm and act accordingly.  See Wisniewski, 494 F.3d at 40 ("[W]e are mindful that '[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.'") (quoting Wood v. Strickland, 420 U.S. 308, 326 (1975)); see also Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986) ("[I]t is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse" and "[t]he determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board.").

b) Application

Applying these standards to B.C.'s conduct, we conclude that his suspension must be upheld.  In Cuff II, we remanded because, inter alia, there were allegations that B.C. "did not show the [astronaut drawing] to any classmates but rather handed it directly to his teacher[,] and B.C. had no other disciplinary history that would suggest a violent tendency." 341 F. App'x at 693.

The record now before us demonstrates that it was reasonably foreseeable that the astronaut drawing could create a substantial disruption at the school.  When B.C. was

9

suspended, he had a history of disciplinary issues, and his other earlier drawings and writings had also embraced violence. Prior to the astronaut drawing incident, Malley discussed B.C.'s other drawings and writings with Knecht, expressing a "concern" for the student, and school psychologist Charette testified that she had spoken with Knecht about B.C.'s disciplinary issues and prior drawings. In addition, the astronaut drawing was seen by other students in the class, and caused C.P., who observed B.C. with the drawing, to leave her seat and bring it to DeBold's attention. DeBold perceived C.P. to be "very worried" about the drawing.

Whether B.C. intended his "wish" as a joke or never intended to carry out the threat is irrelevant. Nor does it matter that B.C. lacked the capacity to carry out the threat expressed in the drawing. See Wisniewski, 494 F.3d at 36, 40 (affirming summary judgment in favor of school administrators for regulating student's speech even though the student protested that his creation of the "buddy icon" was only meant as a joke); see also Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616 (8th Cir. 2002) ("In determining whether a statement amounts to an unprotected threat [under the First Amendment], there is no requirement that . . . the speaker was capable of carrying out the purported threat of violence.").

Courts have allowed wide leeway to school administrators disciplining students for writings or other conduct threatening

10

violence.  See, e.g., Boim, 494 F.3d at 981, 984 (finding that school officials did not violate a student's First Amendment rights when they suspended her for writing a narrative depicting her shooting her math teacher); Ponce, 508 F.3d at 772 (analyzing, under Morse v. Fredrick, 551 U.S. 393 (2007), a student's speech threatening a "Columbine shooting attack" on a school, and finding that "such specific threatening speech to a school or its population is unprotected by the First Amendment" because "[s]chool administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance."); Pulaski Cnty. Special Sch. Dist., 306 F.3d at 626 n.4 (finding it "untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of [the student's letter in which he described how he would rape and murder a classmate] would not have taken some action based on its violent and disturbing content," and holding that the letter constituted a "true threat" under Watts v. United States, 394 U.S. 705 (1969)); LaVine v. Blaine Sch. Dist., 257 F.3d 981, 983, 987, 992 (9th Cir. 2001) (evaluating "the recent spate of school shootings," the "potential for school violence," and the "care when evaluating a student's First Amendment right of free expression against school

11

officials' need to provide a safe school environment," and holding that the school did not violate a student's First Amendment's rights when it expelled him for his poem filled with imagery of violent death and suicide and shooting of fellow students).

The threat of substantial disruption was aggravated by B.C.'s sharing of his "wish" with fellow students, an act reasonably perceived as an attention-grabbing device. School administrators might reasonably fear that, if permitted, other students might well be tempted to copy, or escalate, B.C.'s conduct. This might then have led to a substantial decrease in discipline, an increase in behavior distracting students and teachers from the educational mission, and tendencies to violent acts.[1] Such a chain of events would be difficult to control because the failure to discipline B.C. would give other students engaging in such behavior an Equal Protection argument to add to their First Amendment contentions.

School administrators also have to be concerned about the confidence of parents in a school system's ability to shield their children from frightening behavior and to provide for the safety of their children while in school. B.C.'s "wish," being

---

[1] As one Court of Appeals has already expressed, confronting a threat of school violence may be appropriate given the recent wave of school shootings that have tragically affected our nation: "[a]fter [all the] school shootings, questions have been asked about how teachers and administrators could have missed telltale 'warning signs,' why something was not done earlier and what should be done to prevent such tragedies from happening again." LaVine, 257 F.3d at 987.

12

known by many students, could easily have become known to a number of parents who could reasonably view it as something other than a contribution to the marketplace of ideas. While parents do not have the right to monitor student speech, they could reasonably be concerned about the safety of their children in the present circumstances. A failure of the appellees to respond forcefully to the "wish" might have led to a decline of parental confidence in school safety with many negative effects, including, e.g., the need to hire security personnel and even a decline in enrollment.

Thus, appellees could reasonably have concluded that B.C.'s astronaut drawing would substantially disrupt the school environment, and their resulting decision to suspend B.C. was constitutional.

Appellants also argue that B.C.'s punishment was excessive under the First Amendment. The appropriate degree of punishment is of course a matter in which we show the greatest deference to school authorities. Wood, 420 U.S. at 326. It suffices to say that we see no merit to this argument.

CONCLUSION

For the foregoing reasons, we affirm.

13

POOLER, *Circuit Judge*, dissenting.

A ten-year-old child made a drawing in class that jokingly referred to blowing up his school. His classmates chuckled. His teacher did not. The school suspended him for nearly a week. The boy's parents claim that the school violated their son's right to free speech by punishing him for his ill-advised joke.

The First Amendment does not require our nation's teachers to tolerate every misguided attempt at comedy in the classroom. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court held that a school may, without violating the First Amendment, restrict student speech that threatens to cause a substantial disruption at school. *Id.* at 513. As a result, a school may punish a student for making a joke involving violent or threatening language, no matter how innocent the student's intention, if the joke had the potential to cause a substantial disruption at school, perhaps by sparking panic among classmates who believed, even mistakenly, that they might be in danger.

However, I believe that a jury could conclude that this young child's stab at humor barely had the potential to cause a stir at school, let alone a substantial disruption. Few students even saw the drawing given that the child's teacher took it away in a matter of minutes. And the students who did get a glimpse laughed. Clearly, not everyone at the school thought that the drawing was funny, and for good reason. But I am convinced that a jury could conclude that this young boy's crude attempt at humor merely had the potential to cause mild amusement among his classmates—not alarm. The majority refuses even to allow a jury to consider the question of whether the drawing had the potential to disrupt the work of the school. But in affirming the judgment of the district court, the majority has failed to "construe the facts in the light most

1

favorable to the non-moving party and [to] resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).[1]

Accordingly, I respectfully dissent.

## I.

At the beginning of the school year in September 2007, Tara DeBold, a teacher at Berea Elementary School in Montgomery, N.Y., gave her fifth-grade science class a routine assignment. She handed out sheets of paper that contained a drawing of an astronaut, similar to an outline one might find in a children's coloring book. DeBold explained to her students that they could write about anything they wanted on the astronaut, including "adjectives about themselves, their birthday, things they want to be when they grow up, a wish that they have, [or] a goal they have for the year." J.A. 213.[2] The purpose of the assignment was to allow DeBold to "learn a little bit about" her students at the start of the school year. J.A. 213.

Some students were apparently daunted by the open-ended nature of the assignment. They peppered their teacher with questions about what they were allowed to write. In a moment of apparent frustration, DeBold said, "Don't keep on coming up to me. When I mean anything you want, anything. You can write about missiles." J.A. 72 (internal quotation marks omitted).

---

[1] Throughout this opinion, unless otherwise noted, I present the facts of the case "in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164.

[2] The abbreviation "J.A." refers to the Joint Appendix filed by the parties.

One student, B.C., who was ten years old at the time, saw this as an opportunity to have some fun.  While DeBold was explaining the assignment to the class, B.C. told some of his friends who were sitting near him what he planned to write on his drawing.  The teacher's mention of missiles apparently had sparked an idea in the young boy's mind: he wanted to write a joke about blowing up his school.

While his sense of humor may seem deficient, his audience of fifth-grade peers thought otherwise.  When he mentioned his idea to a few classmates who were sitting nearby, they laughed.  After the teacher finished describing the assignment and answering questions from students, B.C. wrote on his astronaut drawing that he wanted to "blow up the school with all the teachers in it."  J.A. 46; *see also* J.A. 219.  He showed the drawing to some of his classmates.  They chuckled again.  According to B.C., everyone understood that his drawing was a joke.  "No one was scared," he said later.  "Everybody was, like, laughing."  J.A. 75.  As he explained, "I was just joking around with it."  J.A. 73.

Of all the fifth graders in that classroom, only one even arguably showed the slightest sign of taking B.C.'s threat seriously.  A young girl named C.P. saw what B.C. had written and reported him to their teacher.  DeBold claimed that the girl "seemed very worried" by what B.C. had written.  J.A. 214.  There is, however, ample evidence in the record to suggest that C.P. was anything but scared.  C.P. herself was seen laughing along with B.C.'s other classmates who had seen his drawing.  If anything, C.P. hardly seems to have been scarred by the incident.  After B.C. returned to school following his suspension, the two children would exchange greetings in the hallway as if nothing had happened.  *See* J.A. 89-90.

3

Indeed, C.P.'s decision to report B.C. to the teacher was arguably motivated more by spite than fear. The two students had something of a rivalry at school. B.C. described her as "a tattletale," who had told on him in the past "if [he] did something silly or joking." J.A. 75. For example, C.P. would "tattle on" him "if [he] wasn't doing [his] work" or "talking." J.A. 75. She certainly seems to have been a stickler for the rules, reminding B.C. whenever she had the chance that he was not following them. *See* J.A. 75. On this particular occasion, when C.P. reported B.C. to his teacher for making the astronaut drawing, he suspected that "[s]he probably was just trying to get [him] in trouble." J.A. 74. In short, there is sufficient evidence to suggest that while B.C.'s joke was inappropriate, to put it mildly, not a single student took his threat seriously.

Nonetheless, after C.P. reported B.C. to the teacher, and DeBold saw what B.C. had written, DeBold took the drawing away and sent him to the principal's office. The young boy was eventually suspended from school for a total of six days as punishment. The boys' parents now claim that their son's punishment violated the First Amendment.

## II.

The First Amendment bars the federal and state governments from "abridging the freedom of speech." U.S. Const. amend. I; *see Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938). Indeed, the First Amendment "protects the citizen against the State itself and all of its creatures," including public schools. *Tinker*, 393 U.S. at 507 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)); *see also Tinker*, 393 U.S. at 506 ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.").

4

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) (alteration in original) (internal quotation marks omitted). Thus, speech or expression that involves violent content, no matter how distasteful, does not necessarily forfeit all First Amendment protection. *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011).

The Supreme Court, however, has made clear that entire categories of speech and expression do not merit protection under the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). Among these "well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem," are "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.*

There is no doubt that a public school may suppress student speech that falls within one of these categories that the Supreme Court has identified as entirely unprotected by the First Amendment. Indeed, despite the expansion of school-specific exceptions to the First Amendment's general prohibition against government restrictions on speech, *see, e.g.*, *Tinker*, 393 U.S. 503, certain well-settled rules apply to adults and adolescents alike. A true threat under *Watts v. United States*, 394 U.S. 705 (1969) (per curiam), for instance, is as unprotected when uttered in school as it is on the street.

But even an empty threat in the classroom might do just as much harm as a true one made outside the schoolhouse gate. Indeed, we have made clear "that school officials have

5

significantly broader authority to sanction student speech than the Watts standard allows." *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007). A public school may regulate and indeed punish speech by a student that would otherwise be protected if made by an adult in another context. *See Tinker*, 393 U.S. at 506 (concluding that "First Amendment rights" must be "applied in light of the special characteristics of the school environment"); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.").

The Supreme Court has made clear that certain types of speech are considered unprotected when made by students in the school setting. In *Tinker*, the Supreme Court held that a school may suppress student speech without violating the First Amendment if the speech has the potential to "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. Next, in *Fraser*, the Court held that a school may punish a student for "his offensively lewd and indecent speech." *Fraser*, 478 U.S. at 685. *Fraser* explained what every parent already knows. Schools must be allowed to police their students because of "society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. But while the thrust of *Fraser*'s language may have been broad, the case's holding—aimed squarely at "offensively lewd and indecent speech," *id.* at 685—was narrow. Shortly after *Fraser*, the Court held in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Finally, and

6

most recently, the Court held in *Morse v. Frederick*, 551 U.S. 393 (2007), that a school "may . . . restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 403.

The majority concludes that *Tinker* requires that we affirm the district court's grant of summary judgment. I disagree.

### III.

The question under *Tinker* is whether a reasonable jury, drawing every inference in favor of the plaintiffs, could conclude that the school did not reasonably believe that B.C.'s drawing could itself cause a "substantial disruption" at school. *Tinker*, 393 U.S. at 514.

Here, DeBold herself came up with the idea to write about weaponry. *See* J.A. 72 ("Don't keep on coming up to me. When I mean anything you want, anything. You can write about missiles." (internal quotation marks omitted)). When B.C. told his friends about what he wanted to write, they laughed and were unconcerned by what they knew was a joke. They were amused rather than alarmed precisely because his drawing was something of a riff on their teacher's own suggestion to write about missiles, which undoubtedly, at least for some fifth-graders, conjure up images of explosions and mayhem.

The only hint of concern among his classmates came from C.P., who brought B.C.'s drawing to the attention of his teacher. But it seems that even she laughed about the drawing. At his deposition, B.C. testified:

> Q. Do you think C. P. was scared when she read what you wrote?
> A. No. No one was scared. Everybody was, like, laughing.
> Q. Everybody was laughing?
> A. Not like laughing hysterically. Just like a giggle or something.

J.A. 75.

7

While DeBold claims that C.P. "seemed very worried" as a result of seeing what B.C. had written, J.A. 214, any conflict between competing accounts of whether C.P. was in fact frightened by the drawing—and thus whether DeBold's perception of C.P.'s reaction was reasonable—must be resolved in favor of the student, not the school. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.").

The majority simply ignores B.C.'s claim that C.P. laughed along with others when she saw the drawing. Indeed, the majority notes that their teacher "perceived C.P. to be 'very worried,'" Majority Op. at 10, but utterly fails to acknowledge B.C.'s claim to the contrary. In reviewing a district court's grant of summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). The majority casts aside this foundational principle by deciding rather than identifying disputed questions of fact.

Furthermore, a jury might readily conclude that C.P. reported B.C. not because she took his threat seriously or was even slightly scared, but rather because she resented him for pushing the boundaries of acceptable conduct in class and getting away with it. The two certainly had a history of sparring over the rules. And C.P. seems to have taken it upon herself to ensure that B.C. was punished each and every time he did something that was even arguably inappropriate. Accordingly, a jury might conclude that she was well aware that B.C.'s drawing was a joke, but nonetheless reported him to their teacher simply to see him punished. In short, a jury could conclude that she was prim, not petrified.

8

B.C.'s drawing clearly caused at least some disruption in his classroom. By his own account, children laughed and one of his classmates reported him to his teacher. But this momentary interruption hardly constitutes a substantial disruption as contemplated by *Tinker*. If anything, B.C.'s drawing merely diverted students briefly from their schoolwork.

I note only that some disruptions—and perhaps some far more substantial than the one at issue in this case—must no doubt be tolerated, lest the slightest flicker of frustration or fear in a classmate could justify sanctioning a student's speech. Some amount of nominal discord and discomfort is the cost of our "hazardous freedom." *Tinker*, 393 U.S. at 508; *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1271-72 (11th Cir. 2004) ("[I]n assessing the reasonableness of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis*, insubstantial impact on classroom decorum. . . . [S]tudent expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to 'a showing of mild curiosity' by other students, 'discussion and comment' among students, or even some 'hostile remarks' or 'discussion outside of the classrooms' by other students." (citations omitted)).

The First Amendment's protection of free speech cannot hinge entirely on the reaction of a listener to a person's speech. If that were the case, the First Amendment would only be as strong as the weakest, or at least the most thin-skinned, listener in a crowd. *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) ("Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.").

9

In addition, I note that the minor disruption at issue in this case is a far cry from the one we faced in *Wisniewski*, in which an image that could have been interpreted as a violent threat against a teacher circulated for three weeks among students before it came to the attention of school officials. *See Wisniewski*, 494 F.3d at 36. During those weeks, there was ample potential for students who had no information regarding the context in which the violent image was created to interpret it as a truly violent threat against a teacher. Consequently, the image in that case had every chance of terrifying both students and teachers alike.

By contrast, B.C.'s astronaut drawing circulated for a matter of minutes before the teacher took it away and made sure that no one else would see it. And each of the children who did see the drawing knew it was a joke and laughed about it. As a result, I believe that a reasonable jury could conclude that there was no chance that B.C.'s drawing would create anything approaching a substantial disruption.

Indeed, the school's principal explained to B.C.'s parents that "[t]here was zero tolerance" for the type of expression that B.C. used. J.A. 105. As a result, a jury could find that B.C. was punished because the school did not tolerate *any* language or expression that involved a violent threat, even if the student's threat was not a true threat under *Watts*, *see Virginia v. Black*, 538 U.S. 343, 359 (2003) ("'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."), and even if the threat had no potential to cause a substantial disruption under *Tinker*.

## IV.

The majority discusses extensively B.C.'s prior behavioral issues that school officials claim were cause for concern. For example, the majority writes that "[w]hen B.C. was suspended, he had a history of disciplinary issues, and his other earlier drawings and writings had also embraced violence." Majority Op. at 10.

But even if B.C.'s past behavioral issues affected the analysis of whether the astronaut drawing had the potential to cause a substantial disruption under *Tinker*, *see infra* note 3, the majority has displaced the role of the jury by finding facts where genuine disputes exist. For example, the majority writes: "In January 2006, prior to creating the astronaut drawing, B.C. had drawn another picture that was perceived by the school staff as disturbing. The drawing depicted a person firing a gun, and above it, B.C. had written: 'One day I shot 4 people each of them got fo[ur] blows + they were dead. I wasted 20 bulits [sic] on them.'" Majority Op. at 3 (alterations in original) (citations omitted). While the majority notes that "B.C. said that he was portraying a game of paintball in the drawing," Majority Op. at 3, the simply concludes that the "picture . . . was perceived by the school staff as disturbing." Majority Op. at 3.

But whether or not school officials were reasonably concerned by this young boy's drawing is a question for jurors, not judges. B.C. said that when the school psychologist had asked him about the drawing, he explained that he was simply portraying a paintball game, not playing out some violent fantasy. *See* J.A. 85. As a result, the matter seems to have been promptly dropped. No one other than the school psychologist even spoke to B.C. about the drawing. A jury could conclude that school officials—far from finding the drawing "disturbing," as the majority concludes, Majority Op. at 3—simply decided that the drawing was a boy's harmless portrayal of a game he loved to play.

11

The majority also notes: "As part of a fourth grade in-class assignment, B.C. wrote a story about 'a big wind [that] destroyed every school in America. . . . [And] every body ran for there [sic] life and than [sic] all adults died and the kids were alive. Than [sic] all the kids died.'" Majority Op. at 3 (alterations in original). But the majority fails to acknowledge that B.C. explained that he had written the story "around [the time of] a big hurricane or something like that, like a tsunami." J.A. 87. Consequently, a jury might conclude that school officials were aware that B.C. had written the story in response to a natural disaster that merely prompted a young boy to wonder—and perhaps worry—about the danger such disasters pose.

In addition, the majority cites "B.C.'s involvement in numerous altercations during recess, pushing and shoving in the hallways, and rough play at school." Majority Op. at 3-4. In March 2007, for instance, B.C. was cited for "push[ing] his seat mate out into the aisle" while they were riding the school bus. J.A. 161. But a jury could conclude that B.C.'s disciplinary history was hardly unusual for a young child who occasionally misbehaved.

Furthermore, I do not believe that B.C.'s prior disciplinary history, and indeed any past behavioral problems, are directly relevant under *Tinker*.[3] Indeed, the question under *Tinker* is whether this boy's speech itself had the potential to cause a disruption at school, not whether the drawing might have predicted that B.C. was planning an attack.

---

[3] I note that in certain situations, in evaluating a student's threat under *Tinker*, it may be appropriate, and even necessary, to assess the student's prior disciplinary history as part of an inquiry into whether or not school officials reasonably believed that the threat might cause a substantial disruption. For instance, if a student who makes a threat had a history of aggressive and violent behavior—and his or her classmates were aware of that history—then they might be more likely to take such a threat seriously. As a result, such a threat might reasonably be expected to cause a substantial disruption by frightening members of the school community, even if the same threat, when made by another student, might not. In this case, however, I believe that a jury could conclude that B.C.'s drawing, even in light of any prior problems he may have had, still did not have the potential to cause such fear.

12

In *Tinker*, the issue was whether the First Amendment protected students who wore black armbands in school to signal their opposition to the Vietnam War. The school banned the armbands because of the school's "wish to avoid the controversy which might *result* from the expression." *Tinker*, 393 U.S. at 510 (emphasis added). The concern was that the expression *itself*— that is, the symbolic act of wearing an armband—would cause a disruption among the students, one that, given the undoubtedly strong feelings held by many students about the war, "might evolve into something which would be difficult to control." *Tinker*, 393 U.S. at 509 n.3 (internal quotation mark omitted); *see also Wisniewski*, 494 F.3d at 38 (describing *Tinker* as holding "that student expression may not be suppressed unless school officials reasonably conclude that *it*"—that is, the expression itself—"will 'materially and substantially disrupt the work and discipline of the school'" (emphasis added)).

The school in *Tinker* was not worried that the armbands might signal a desire on the part of the students wearing them to lash out violently against their classmates, but rather just the opposite—that other students might lash out at them. *See Tinker,* 393 U.S. at 508 ("Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance."). Put simply, *Tinker* held that a school may restrict speech that *itself* has the potential to *cause* a substantial disruption. In other words, *Tinker* requires a causal link between the speech that school officials want to suppress and the substantial disruption that they wish to avoid.

The Supreme Court has made clear that even though the First Amendment may permit restrictions on certain speech in order to avoid the harmful effects of such expression, there must be, at a minimum, a causal relationship between the speech that the government wants to suppress and the harmful effects that justify the suppression. In *Ashcroft v. Free Speech*

13

*Coalition*, 535 U.S. 234 (2002), the Court rejected an attempt to restrict expression in part because "the causal link" between the expression that the government sought to restrict and the harm it wanted to prevent was "contingent and indirect." *Id.* at 250. The *Ashcroft* Court wrote: "The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts." *Id.*; *see also Morse*, 551 U.S. at 410 ("It was reasonable for [the school's principal] to conclude that the banner promoted illegal drug use—in violation of established school policy—and that failing to act would send a powerful message to the students in her charge . . . about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events *student expression that contributes to those dangers*." (emphasis added)).

To be sure, the Supreme Court used the word "forecast" in *Tinker*, concluding that "the record does not demonstrate any facts which might reasonably have led school authorities to *forecast* substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514 (emphasis added); *see also Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008) ("The question is not whether there has been actual disruption, but whether school officials "might reasonably *portend* disruption" from the student expression at issue." (emphasis added) (quoting *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001))). But the facts of *Tinker*—which involved political speech that *itself* had the potential to provoke a violent reaction from other students—clearly indicate that the Court was merely contemplating that school authorities might correctly forecast that the speech at issue had the potential to cause a disruption, not that the speech might somehow forecast or predict the actions of a particular student.

14

The majority follows the lead of other courts by relying on our justified fears of yet another horrific school shooting in an effort to innoculate the school's actions against constitutional scrutiny. *See* Majority Op. at 11 ("Courts have allowed wide leeway to school administrators disciplining students for writings or other conduct threatening violence."); Majority Op. at 10 ("When B.C. was suspended, he had a history of disciplinary issues, and his other earlier drawings and writings had also embraced violence."); *see also Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007) ("School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance."); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) ("We can only imagine what would have happened if the school officials, after learning of Rachel's writing, did nothing about it and the next day Rachel did in fact come to school with a gun and shoot and kill her math teacher.").

But there is absolutely no question that a school, upon reading a student's journal entry or overhearing a comment made in class, can investigate—and even detain—that student in order to determine whether he poses a threat to himself or others at the school. As we concluded in *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267 (2d Cir. 2011), "a school administrator must be able to react to ambiguous student speech by temporarily removing the student from potential danger (to himself and others) until it can be determined whether the speech represents a real threat to school safety and student learning." *Id.* at 274. As a result, there is no doubt that a school may respond to a student's use of violent language in order to determine whether the student poses "a real threat," *id.*, and thus take *protective* action in order to ensure school safety,

15

*see id.* ("In their various roles, school administrators must distinguish empty boasts from serious threats, rough-housing from bullying, and an active imagination from a dangerous impulse. Making such distinctions often requires an investigation, and the investigation may result in discipline, but the investigation itself is not disciplinary—it is precautionary and protective."). Indeed, a school certainly need not wait for a disruption to occur in order "to step in before actual violence erupts." *Morse*, 551 U.S. at 425 (Alito, J., concurring).

## V.

While a young child's call for the destruction of his school and the killing of his teachers may not seem to "justif[y] sounding the First Amendment bugle," *Morse*, 551 U.S. at 409, I believe that there are important, if subtle, free speech values at stake in this case.

B.C.'s teacher explicitly suggested that her students consider writing about missiles. While the concept of irony may seem well beyond the ken of an average ten-year-old, young children routinely experiment with the seeds of satire. They learn by fumbling their way to finding the boundaries between socially permissible, and even encouraged, forms of expression that employ exaggeration for rhetorical effect, and impermissible and offensive remarks that merely threaten and alienate those around them.

This young boy's drawing was clearly not some subtle, ironic jab at his school or broader commentary about education. It was a crude joke. But the First Amendment should make us hesitate before silencing students who experiment with hyperbole for comic effect, however unknowing and unskillful that experimentation may be. *See Yankee Publ'g Inc. v. News Am.*

16

*Publ'g Inc.*, 809 F. Supp. 267, 280 (S.D.N.Y. 1992) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.").

For the foregoing reasons, I respectfully dissent.