POOLER, Circuit Judge,
dissenting:
A ten-year-old child made a drawing in class that jokingly referred to blowing up his school. His classmates chuckled. His teacher did not. The school suspended him for nearly a week. The boy’s parents claim that the school violated their son’s right to free speech by punishing him for his ill-advised joke.
The First Amendment does not require our nation’s teachers to tolerate every misguided attempt at comedy in the classroom. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Supreme Court held that a school may, without violating the First Amendment, restrict student speech that threatens to cause a substantial disruption at school. Id. at 513, 89 S.Ct. 733. As a result, a school may punish a student for making a joke involving violent or threatening language, no matter how innocent the student’s intention, if the joke had the potential to cause a substantial disruption at school, perhaps by sparking panic among classmates who believed, even mistakenly, that they might be in danger.
However, I believe that a jury could conclude that this young child’s stab at humor barely had the potential to cause a stir at school, let alone a substantial disruption. Few students even saw the drawing given that the child’s teacher took it away in a matter of minutes. And the *116 students who did get a glimpse laughed. Clearly, not everyone at the school thought that the drawing was funny, and for good reason. But I am convinced that a jury could conclude that this young boy’s crude attempt at humor merely had the potential to cause mild amusement among his classmates — not alarm. The majority refuses even to allow a jury to consider the question of whether the drawing had the potential to disrupt the work of the school. But in affirming the judgment of the district court, the majority has failed to “construe the facts in the light most favorable to the non-moving party and [to] resolve all ambiguities and draw all reasonable inferences against the movant.” Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir.2011) (internal quotation marks omitted).[1]
Accordingly, I respectfully dissent.
I.
At the beginning of the school year in September 2007, Tara DeBold, a teacher at Berea Elementary School in Montgomery, N.Y., gave her fifth-grade science class a routine assignment. She handed out sheets of paper that contained a drawing of an astronaut, similar to an outline one might find in a children’s coloring book. DeBold explained to her students that they could write about anything they wanted on the astronaut, including “adjectives about themselves, their birthday, things they want to be when they grow up, a wish that they have, [or] a goal they have for the year.” J.A. 213.[2] The purpose of the assignment was to allow DeBold to “learn a little bit about” her students at the start of the school year. J.A. 213.
Some students were apparently daunted by the open-ended nature of the assignment. They peppered them teacher with questions about what they were allowed to write. In a moment of apparent frustration, DeBold said, “Don’t keep on coming up to me. When I mean anything you want, anything. You can write about missiles.” J.A. 72 (internal quotation marks omitted).
One student, B.C., who was ten years old at the time, saw this as an opportunity to have some fun. Wdiile DeBold was explaining the assignment to the class, B.C. told some of his friends who were sitting near him what he planned to write on his drawing. The teacher’s mention of missiles apparently had sparked an idea in the young boy’s mind: he wanted to write a joke about blowing up his school.
While his sense of humor may seem deficient, his audience of fifth-grade peers thought otherwise. When he mentioned his idea to a few classmates who were sitting nearby, they laughed. After the teacher finished describing the assignment and answering questions from students, B.C. wrote on his astronaut drawing that he wanted to “blow up the school with all the teachers in it.” J.A. 46; see also J.A. 219. He showed the drawing to some of his classmates. They chuckled again. According to B.C., everyone understood that his drawing was a joke. “No one was scared,” he said later. “Everybody was, like, laughing.” J.A. 75. As he explained, “I was just joking around with it.” J.A. 73.
Of all the fifth graders in that classroom, only one even arguably showed the slightest sign of taking B.C.’s threat seriously. A *117 young girl named C.P. saw what B.C. had written and reported him to their teacher. DeBold claimed that the girl “seemed very worried” by what B.C. had written. J.A. 214. There is, however, ample evidence in the record to suggest that C.P. was anything but scared. C.P. herself was seen laughing along with B.C.’s other classmates who had seen his drawing. If anything, C.P. hardly seems to have been scarred by the incident. After B.C. returned to school following his suspension, the two children would exchange greetings in the hallway as if nothing had happened. See J.A. 89-90.
Indeed, C.P.’s decision to report B.C. to the teacher was arguably motivated more by spite than fear. The two students had something of a rivalry at school. B.C. described her as “a tattletale,” who had told on him in the past “if [he] did something silly or joking.” J.A. 75. For example, C.P. would “tattle on” him “if [he] wasn’t doing [his] work” or “talking.” J.A. 75. She certainly seems to have been a stickler for the rules, reminding B.C. whenever she had the chance that he was not following them. See J.A. 75. On this particular occasion, when C.P. reported B.C. to his teacher for making the astronaut drawing, he suspected that “[s]he probably was just trying to get [him] in trouble.” J.A. 74. In short, there is sufficient evidence to suggest that while B.C.’s joke was inappropriate, to put it mildly, not a single student took his threat seriously.
Nonetheless, after C.P. reported B.C. to the teacher, and DeBold saw what B.C. had written, DeBold took the drawing away and sent him to the principal’s office. The young boy was eventually suspended from school for a total of six days as punishment. The boys’ parents now claim that their son’s punishment violated the First Amendment.
II.
The First Amendment bars the federal and state governments from “abridging the freedom of speech.” U.S. Const. amend. I; see Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Indeed, the First Amendment “protects the citizen against the State itself and all of its creatures,” including public schools. Tinker, 393 U.S. at 507, 89 S.Ct. 733 (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)); see also Tinker, 393 U.S. at 506, 89 S.Ct. 733 (“It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate”).
“[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (alteration in original) (internal quotation marks omitted). Thus, speech or expression that involves violent content, no matter how distasteful, does not necessarily forfeit all First Amendment protection. See Brown v. Entm’t Merchants Ass’n, — U.S.-, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011).
The Supreme Court, however, has made clear that entire categories of speech and expression do not merit protection under the First Amendment. See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Among these “well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise- any Constitutional problem,” are “the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ *118 words — those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” Id.
There is no doubt that a public school may suppress student speech that falls within one of these categories that the Supreme Court has identified as entirely unprotected by the First Amendment. Indeed, despite the expansion of school-specific exceptions to the First Amendment’s general prohibition against government restrictions on speech, see, e.g., Tinker, 393 U.S. 503, 89 S.Ct. 733, certain well-settled rules apply to adults and adolescents alike. A true threat under Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), for instance, is as unprotected when uttered in school as it is on the street.
But even an empty threat in the classroom might do just as much harm as a true one made outside the schoolhouse gate. Indeed, we have made clear “that school officials have significantly broader authority to sanction student speech than the Watts standard allows.” Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 38 (2d Cir.2007). A public school may regulate and indeed punish speech by a student that would otherwise be protected if made by an adult in another context. See Tinker, 393 U.S. at 506, 89 S.Ct. 733 (concluding that “First Amendment rights” must be “applied in light of the special characteristics of the school environment”); see also Bethel Sch. Dist. No. 103 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (“[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.”).
The Supreme Court has made clear that certain types of speech are considered unprotected when made by students in the school setting. In Tinker, the Supreme Court held that a school may suppress student speech without violating the First Amendment if the speech has the potential to “materially and substantially disrupt the work and discipline of the school.” Tinker, 393 U.S. at 513, 89 S.Ct. 733. Next, in Fraser, the Court held that a school may punish a student for “his offensively lewd and indecent speech.” Fraser, 478 U.S. at 685, 106 S.Ct. 3159. Fraser explained what every parent already knows. Schools must be allowed to police their students because of “society’s countervailing interest in teaching students the boundaries of socially appropriate behavior.” Id. at 681, 106 S.Ct. 3159. But while the thrust of Fraser’s language may have been broad, the case’s holding — aimed squarely at “offensively lewd and indecent speech,” id. at 685, 106 S.Ct. 3159 — was narrow. Shortly after Fraser, the Court held in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), “that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored activities so long as their actions are reasonably related to legitimate pedagogical concerns.” Id. at 273, 108 S.Ct. 562. Finally, and most recently, the Court held in Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), that a school “may ... restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use.” Id. at 403, 127 S.Ct. 2618.
The majority concludes that Tinker requires that we affirm the district court’s grant of summary judgment. I disagree.
III.
The question under Tinker is whether a reasonable jury, drawing every inference in favor of the plaintiffs, could conclude that the school did not reasonably believe *119 that B.C.’s drawing could itself cause a “substantial disruption” at school. Tinker, 393 U.S. at 514, 89 S.Ct. 733.
Here, DeBold herself came up with the idea to write about weaponry. See J.A. 72 (“Don’t keep on coming up to me. When I mean anything you want, anything. You can write about missiles.” (internal quotation marks omitted)). When B.C. told his friends about what he wanted to write, they laughed and were unconcerned by what they knew was a joke. They were amused rather than alarmed precisely because his drawing was something of a riff on their teacher’s own suggestion to write about missiles, which undoubtedly, at least for some fifth-graders, conjure up images of explosions and mayhem.
The only hint of concern among his classmates came from C.P., who brought B.C.’s drawing to the attention of his teacher. But it seems that even she laughed about the drawing. At his deposition, B.C. testified:
Q. Do you think C.P. was scared when she read what you wrote?
A.No. No one was scared. Everybody was, like, laughing.
Q. Everybody was laughing?
A. Not like laughing hysterically. Just like a giggle or something.
J.A. 75.
While DeBold claims that C.P. “seemed very worried” as a result of seeing what B.C. had written, J.A. 214, any conflict between competing accounts of whether C.P. was in fact frightened by the drawing — and thus whether DeBold’s perception of C.P.’s reaction was reasonable-must be resolved in favor of the student, not the school. See United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994) (“Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for.the court on summary judgment.”).
The majority simply ignores B.C.’s claim that C.P. laughed along with others when she saw the drawing. Indeed, the majority notes that their teacher “perceived C.P. to be ‘very worried,’ ” Majority Op. at 114, but utterly fails to acknowledge B.C.’s claim to the contrary. In reviewing a district court’s grant of summary judgment, “[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.” Brod, 653 F.3d at 164 (quoting Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.2010)) (internal quotation marks omitted). The majority casts aside this foundational principle by deciding rather than identifying disputed questions of fact.
Furthermore, a jury might readily conclude that C.P. reported B.C. not because she took his threat seriously or was even slightly scared, but rather because she resented him for pushing the boundaries of acceptable conduct in class and getting away with it. The two certainly had a history of sparring over the rules. And C.P. seems to have taken it upon herself to ensure that B.C. was punished each and every time he did something that was even arguably inappropriate. Accordingly, a jury might conclude that she was well aware that B.C.’s drawing was a joke, but nonetheless reported him to their teacher simply to see him punished. In short, a jury could conclude that she was prim, not petrified.
B.C.’s drawing clearly caused at least some disruption in his classroom. By his own account, children laughed and one of his classmates reported him to his teacher. But this momentary interruption hardly constitutes a substantial disruption as contemplated by Tinker. If anything, B.C.’s drawing merely diverted students briefly from their schoolwork.
*120 I note only that some disruptions — and perhaps some far more substantial than the one at issue in this case — must no doubt be tolerated, lest the slightest flicker of frustration or fear in a classmate could justify sanctioning a student’s speech. Some amount of nominal discord and discomfort is the cost of our “hazardous freedom.” Tinker, 393 U.S. at 508, 89 S.Ct. 733; see also Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1271-72 (11th Cir.2004) (“[I]n assessing the reasonableness of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some de minimis, insubstantial impact on classroom decorum. ... [Sjtudent expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to ‘a showing of mild curiosity’ by other students, ‘discussion and comment’ among students, or even some ‘hostile remarks’ or ‘discussion outside of the classrooms’ by other students.” (citations omitted)).
The First Amendment’s protection of free speech cannot hinge entirely on the reaction of a listener to a person’s speech. If that were the case, the First Amendment would only be as strong as the weakest, or at least the most thin-skinned, listener in a crowd. See Brown v. Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (“Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.”).
In addition, I note that the minor disruption at issue in this case is a far cry from the one we faced in Wisniewski, in which an image that could have been interpreted as a violent threat against a teacher circulated for three weeks among students before it came to the attention of school officials. See Wisniewski, 494 F.3d at 36. During those weeks, there was ample potential for students who had no information regarding the context in which the violent image was created to interpret it as a truly violent threat against a teacher. Consequently, the image in that case had every chance of terrifying both students and teachers alike.
By contrast, B.C.’s astronaut drawing circulated for a matter of minutes before the teacher took it away and made sure that no one else would see it. And each of the children who did see the drawing knew it was a joke and laughed about it. As a result, I believe that a reasonable jury could conclude that there was no chance that B.C.’s drawing would create anything approaching a substantial disruption.
Indeed, the school’s principal explained to B.C.’s parents that “[tjhere was zero tolerance” for the type of expression that B.C. used. J.A. 105. As a result, a jury could find that B.C. was punished because the school did not tolerate any language or expression that involved a violent threat, even if the student’s threat was not a true threat under Watts, see Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (“ ‘True threats’ encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.”), and even if the threat had no potential to cause a substantial disruption under Tinker.
IV.
The majority discusses extensively B.C.’s prior behavioral issues that school officials claim were cause for concern. For example, the majority writes that “[w]hen B.C. was suspended, he had a *121 history of disciplinary issues, and his other earlier drawings and writings had also embraced violence.” Majority Op. at 113-14.
But even if B.C.’s past behavioral issues affected the analysis of whether the astronaut drawing had the potential to cause a substantial disruption under Tinker, see infra note 3, the majority has displaced the role of the jury by finding facts where genuine disputes exist. For example, the majority writes: “In January 2006, prior to creating the astronaut drawing, B.C. had drawn another picture that was perceived by the school staff as disturbing. The drawing depicted a person firing a gun, and above it, B.C. had written: ‘One day I shot 4 people each of them got fo[ur] blows + they were dead. I wasted 20 bulits [sic] on them.’ ” Majority Op. at 111 (alterations in original) (citations omitted). While the majority notes that “B.C. said that he was portraying a game of paintball in the drawing,” Majority Op. at 111, the simply concludes that the “picture ... was perceived by the school staff as disturbing.” Majority Op. at 111.
But whether or not school officials were reasonably concerned by this young boy’s drawing is a question for jurors, not judges. B.C. said that when the school psychologist had asked him about the drawing, he explained that he was simply portraying a paintball game, not playing out some violent fantasy. See J.A. 85. As a result, the matter seems to have been promptly dropped. No one other than the school psychologist even spoke to B.C. about the drawing. A jury could conclude that school officials — far from finding the drawing “disturbing,” as the majority concludes, Majority Op. at 111 — simply decided that the drawing was a boy’s harmless portrayal of a game he loved to play.
The majority also notes: “As part of a fourth grade in-class assignment, B.C. wrote a story about ‘a big wind [that] destroyed every school in America.... [And] every body ran for there [sic] life and than [sic] all adults died and the kids were alive. Than [sic] all the kids died.’ ” Majority Op. at 111 (alterations in original). But the majority fails to acknowledge that B.C. explained that he had written the story “around [the time of] a big hurricane or something like that, like a tsunami.” J.A. 87. Consequently, a jury might conclude that school officials were aware that B.C. had written the story in response to a natural disaster that merely prompted a young boy to wonder — and perhaps worry — about the danger such disasters pose.
In addition, the majority cites “B.C.’s involvement in numerous altercations during recess, pushing and shoving in the hallways, and rough play at school.” Majority Op. at 111. In March 2007, for instance, B.C. was cited for “pushfing] his seat mate out into the aisle” while they were riding the school bus. J.A. 161. But a jury could conclude that B.C.’s disciplinary history was hardly unusual for a young child who occasionally misbehaved.
Furthermore, I do not believe that B.C.’s prior disciplinary history, and indeed any past behavioral problems, are directly relevant under Tinker.[3] Indeed, *122 the question under Tinker is whether this boy’s speech itself had the potential to cause a disruption at school, not whether the drawing might have predicted that B.C. was planning an attack.
In Tinker, the issue was whether the First Amendment protected students who wore black armbands in school to signal their opposition to the Vietnam War. The school banned the armbands because of the school’s “wish to avoid the controversy which might result from the expression.” Tinker, 393 U.S. at 510, 89 S.Ct. 733 (emphasis added). The concern was that the expression itself — that is, the symbolic act of wearing an armband — would cause a disruption among the students, one that, given the undoubtedly strong feelings held by many students about the war, “might evolve into something which would be difficult to control.” Tinker, 393 U.S. at 509 n. 3, 89 S.Ct. 733 (internal quotation mark omitted); see also Wisniewski, 494 F.3d at 38 (describing Tinker as holding “that student expression may not be suppressed unless school officials reasonably conclude that it” — that is, the expression itself— “will ‘materially and substantially disrupt the work and discipline of the school’ ” (emphasis added)).
The school in Tinker was not worried that the armbands might signal a desire on the part of the students wearing them to lash out violently against their classmates, but rather just the opposite — that other students might lash out at them. See Tinker, 393 U.S. at 508, 89 S.Ct. 733 (“Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.”). Put simply, Tinker held that a school may restrict speech that itself has the potential to cause a substantial disruption. In other words, Tinker requires a causal link between the speech that school officials want to suppress and the substantial disruption that they wish to avoid.
The Supreme Court has made clear that even though the First Amendment may permit restrictions on certain speech in order to avoid the harmful effects of such expression, there must be, at a minimum, a causal relationship between the speech that the government wants to suppress and the harmful effects that justify the suppression. In Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), the Court rejected an attempt to restrict expression in part because “the causal link” between the expression that the government sought to restrict and the harm it wanted to prevent was “contingent and indirect.” Id. at 250, 122 S.Ct. 1389. The Ashcroft Court wrote: “The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts.” Id.; see also Morse, 551 U.S. at 410, 127 S.Ct. 2618 (“It was reasonable for [the school’s principal] to conclude that the banner promoted illegal drug use — in violation of established school policy — and that failing to act would send a powerful message to the students in her charge ... about how serious the school was about the dangers of illegal drug use. The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers.” (emphasis added)).
To be sure, the Supreme Court used the word “forecast” in Tinker, concluding that “the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school *123 activities.” Tinker, 393 U.S. at 514, 89 S.Ct. 733 (emphasis added); see also Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir.2008) (“The question is not whether there has been actual disruption, but whether school officials ‘might reasonably portend disruption’ from the student expression at issue.” (emphasis added) (quoting LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir.2001))). But the facts of Tinker— which involved political speech that itself had the potential to provoke a violent reaction from other students — clearly indicate that the Court was merely contemplating that school authorities might correctly forecast that the speech at issue had the potential to cause a disruption, not that the speech might somehow forecast or predict the actions of a particular student.
The majority follows the lead of other courts by relying on our justified fears of yet another horrific school shooting in an effort to inoculate the school’s actions against constitutional scrutiny. See Majority Op. at 114 (“Courts have allowed wide leeway to school administrators disciplining students for writings or other conduct threatening violence.”); Majority Op. at 113-14 (“When B.C. was suspended, he had a history of disciplinary issues, and his other earlier drawings and writings had also embraced violence.”); see also Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 772 (5th Cir.2007) (“School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a reál risk of substantial disturbance.”); Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 984 (11th Cir.2007) (“We can only imagine what would have happened if the school officials, after learning of Rachel’s writing, did nothing about it and the next day Rachel did in fact come to school with a gun and shoot and kill her math teacher.”).
But there is absolutely no question that a school, upon reading a student’s journal entry or overhearing a comment made in class, can investigate — and even detain— that student in order to determine whether he poses a threat to himself or others at the school. As we concluded in Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267 (2d Cir.2011), “a school administrator must be able to react to ambiguous student speech by temporarily removing the student from potential danger (to himself and others) until it can be determined whether the speech represents a real threat to school safety and student learning.” Id. at 274. As a result, there is no doubt that a school may respond to a student’s use of violent language in order to determine whether the student poses “a real threat,” id., and thus take protective action in order to ensure school safety, see id. (“In their various roles, school administrators must distinguish empty boasts from serious threats, rough-housing from bullying, and an active imagination from a dangerous impulse. Making such distinctions often requires an investigation, and the investigation may result in discipline, but the investigation itself is not disciplinary — it is precautionary and protective.”). Indeed, a school certainly need not wait for a disruption to occur in order “to step in before actual violence erupts.” Morse, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concurring).
V.
While a young child’s call for the destruction of his school and the killing of his teachers may not seem to “justif[y] sounding the First Amendment bugle,” Morse, 551 U.S. at 409, 127 S.Ct. 2618, I believe that there are important, if subtle, free speech values at stake in this case.
B.C.’s teacher explicitly suggested that her students consider writing about mis *124 siles. While the concept of irony may seem well beyond the ken of an average ten-year-old, young children routinely experiment with the seeds of satire. They learn by fumbling their way to finding the boundaries between socially permissible, and even encouraged, forms of expression that employ exaggeration for rhetorical effect, and impermissible and offensive remarks that merely threaten and alienate those around them.
This young boy’s drawing was clearly not some subtle, ironic jab at his school or broader commentary about education. It was a crude joke. But the First Amendment should make us hesitate before silencing students who experiment with hyperbole for comic effect, however unknowing and unskillful that experimentation may be. See Yankee Publ’g Inc. v. News Am. Publ’g Inc., 809 F.Supp. 267, 280 (S.D.N.Y.1992) (“First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.”).
For the foregoing reasons, I respectfully dissent.

. Throughout this opinion, unless otherwise noted, I present the facts of the case "in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant.” Brod, 653 F.3d at 164.

. The abbreviation "J.A.” refers to the Joint Appendix filed by the parties.

. I note that in certain situations, in evaluating a student’s threat under Tinker, it may be appropriate, and even necessary, to assess the student's prior disciplinary history as part of an inquiry into whether or not school officials reasonably believed that the threat might cause a substantial disruption. For instance, if a student who makes a threat had a history of aggressive and violent behavior — and his or her classmates were aware of that history— then they might be more likely to take such a threat seriously. As a result, such a threat might reasonably be expected to cause a substantial disruption by frightening members of the school community, even if the same threat, when made by another student, might *122 not. In this case, however, I believe that a jury could conclude that B.C.'s drawing, even in light of any prior problems he may have had, still did not have the potential to cause such fear.